IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2014 Term

**FILED**
**November 13, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-1083

JENNIE BROOKS; WALTER BOYLE and VAUGHNA BOYLE;
and BERNIE THOMPSON and NANCY THOMPSON,
Plaintiffs Below, Petitioners

v.

CITY OF HUNTINGTON, a West Virginia municipal corporation,
Defendant Below, Respondent

Appeal from the Circuit Court of Wayne County
The Honorable Darrell Pratt, Judge
Case No. 11-C-125

REVERSED; VACATED AND REMANDED

Submitted:  September 30, 2014
Filed:  November 13, 2014

John W. Barrett, Esq.                     Johnnie E. Brown, Esq.
Jonathan R. Marshall, Esq.                Jill M. Harlan, Esq.
Michael B. Hissam, Esq.                   PULLIN, FOWLER, FLANAGAN,
BAILEY & GLASSER LLP                      BROWN & POE, PLLC
Charleston, West Virginia                 Charleston, West Virginia
Attorneys for Petitioners                 Attorney for Respondent

JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE BENJAMIN concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.      "This Court reviews the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review."  Syl. Pt. 1, *Burke-Parsons-Bowlby Corp. v. Rice*, 230 W.Va. 105, 736 S.E.2d 338 (2012).

2.      "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

3.      "When realty is injured the owner may recover the cost of repairing it, plus his expenses stemming from the injury, including loss of use during the repair period. If the injury cannot be repaired or the cost of repair would exceed the property's market value, then the owner may recover its lost value, plus his expenses stemming from the injury including loss of use during the time he has been deprived of his property." Syl. Pt. 2, *Jarrett v. E. L. Harper & Son, Inc.,* 160 W.Va. 399, 235 S.E.2d 362 (1977).

4.      When residential real property is damaged, the owner may recover the reasonable cost of repairing it even if the costs exceed its fair market value before the

i

damage. The owner may also recover the related expenses stemming from the injury, annoyance, inconvenience, and aggravation, and loss of use during the repair period. If the damage cannot be repaired, then the owner may recover the fair market value of the property before it was damaged, plus the related expenses stemming from the injury, annoyance, inconvenience, and aggravation, and loss of use during the time he has been deprived of his property. To the extent that Syllabus Point 2 of *Jarrett v. E. L. Harper & Son, Inc.*, 160 W. Va. 399, 235 S.E.2d 362 (1977) states otherwise, it is hereby modified.

5.    To the extent that damages for cost of repair to residential real property exceed the fair market value of the property before it was damaged, damages awarded for cost of repair must be reasonable in relation to its fair market value before it was damaged. The measure of reasonable cost of repair damages is an issue for the trier of fact, but may be found to be unreasonable as a matter of law if unreasonably disproportionate to the fair market value of the property prior to the damage.

6.    Where the owner of residential real property which is damaged can establish that the pre-damage fair market value of the residential real property cannot be fully restored by repairs and that a permanent, appreciable residual diminution in value will exist even after such repairs are made, then the owner may recover both the cost of repair and for such remaining diminution in value.

WORKMAN, Justice:

Petitioners/plaintiffs below, Jennie Brooks, et al,[1] (hereinafter "petitioners") appeal the Circuit Court of Wayne County's grant of respondent/defendant City of Huntington's (hereinafter "respondent") motion for remittitur, following a four-day jury trial. The jury found respondent negligent in its maintenance of a "trash rack" within the Krouts Creek Stormwater Management project located in the City of Huntington, which negligence proximately caused flooding in petitioners' Spring Valley neighborhood. The jury awarded damages to petitioners for, among other things, the diminished value of their homes as well as the cost to raise the homes' foundations to prevent additional flooding. In granting respondent's motion for remittitur, the circuit court found that petitioners were only entitled to the lesser of the diminution of value of their homes or the cost of the foundation repair; accordingly, the circuit court remitted the verdict to provide recovery for only the lost value of the homes.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erred in remitting the verdict. We therefore reverse, vacate and remand for further proceedings below consistent with this opinion.

---

[1] Although there were thirty plaintiffs below and thirty plaintiffs who were named in the Notice of Appeal, the parties agree in their briefs that only five are pursuing this appeal: Jennie Brooks, Walter and Vaughna Boyle, and Bernie and Nancy Thompson.

1

## I. FACTS AND PROCEDURAL HISTORY

In 2005, the City of Huntington constructed the Krouts Creek Stormwater Management project to deal with nuisance floodwaters within the city limits. The project directed stormwater flowing from Krouts Creek into a culvert underneath the City of Huntington, where it exited into a stream closer to the Ohio River. The project contained a "trash rack" which collected debris from the stormwater before it entered the culvert. After the project was completed, Spring Valley began experiencing flooding, most recently in May 2011.[2] Petitioners' expert testified that the City was negligent in clearing trash and other debris from the "trash rack," which failure caused the stormwater to back up into Spring Valley and caused the May, 2011 flood.

At trial, petitioners' experts testified that petitioners' homes had lost between thirty-five and seventy-five percent of their value as a result of the respondent's negligence and a new benchmark flood elevation had been created. As a result of the new flood elevation, petitioners' homes now sit within the 100-year flood plain, necessitating elevation of the homes by two feet to take their homes out of the new benchmark flood elevation.[3] With respect to the loss of value, petitioners' expert testified

---

[2] A previous lawsuit was litigated regarding all the flooding that occurred before the May 2011 flood; a jury found that the City negligently maintained the stormwater control system and awarded damages.

[3] With regard to raising the homes, petitioners' expert testified:
(continued . . .)

that the market in this area of Spring Valley has "died" as a result of the continued flooding and will not recover even if the flooding does not continue.[4]

---

> You know, they're actually not even getting back to where they were.  So, we're not making them better.  We're just getting the homes, trying to get the homes, back as close to a pre-flood state as we could. . . . . [I]t's not even back to where it was because you're going to have access issues when you raise that home.  You're going to have more steps to go up into it.  It's going to look a little you know, look a little funny unless you do some special landscaping around the house or aesthetic features to make it look right.  Also you're going to lose space upstairs, because anything important in the crawl space, you've got to find a spot for it upstairs.  So you might lose a closet.  You might lose your kitchen pantry.

[4] With regard to the status of the market in the area, petitioners' expert testified as follows:

> Q.     . . . . So, Mr. Dawson, what is happening?  What's the market doing in this area?
>
> A.     It's not doing anything.  It died.  There's been no activity.  Since the May '11, flood, there's been practically no activity, whatsoever, listings or sales.

\* \* \*

> A.     . . . . Prior to the flooding, it was a functioning neighborhood.  Everything was as normal.  After the four floods that happened, you saw a noticeable difference in the activity in there.  There were a few transfers, mostly just foreclosures that occurred there.
>
> A.     People don't want flooded properties.  I mean, and that out of those flooded properties there's definitely a defined loss in value attributed to that flooding.

\* \* \*

> Q.     Well, I guess my question is you're basically guessing about what's going to happen 10 years down the line, let alone 20 years down the line.  Don't you agree with me?

(continued . . .)

The trial court instructed the jury that, if they found in favor of petitioners, petitioners should be awarded the lesser of either their cost of repair or the decrease in value of their property (diminution in value). Nevertheless, the jury verdict form contained line items for both measures of damages. The jury awarded petitioners damages for *both* the cost to elevate the homes as well as their diminution in value.[5] Following the jury's verdict, respondent moved for a new trial and remittitur. The circuit court denied respondent's motion for a new trial,[6] but granted remittitur of the jury awards for the cost to raise the homes. The circuit court determined that West Virginia law permits only recovery for the lesser of cost of repair[7] or diminution in value and therefore struck those amounts from the jury's verdict. It is from this order that petitioners appeal.

---

> A.  In the affected area, the flood area, I'm not guessing. That area is going to die. . . . .
>
> Q.  You don't think it could turn around if there's no more flooding?
>
> A.  No, sir, I don't.

[5] In addition to these damages, petitioners were also awarded the cost to repair their HVAC systems, damages to personal property, and annoyance, inconvenience and loss of use.

[6] Respondent did not cross-appeal the denial of its motion for a new trial.

[7] Respondent argued, as to this issue, that the elevation of the homes was an "improvement" and not a "repair." The circuit court found that the elevation was, in fact, a "repair." Respondent did not cross-assign this finding as error and accordingly, this issue is not properly before the Court. Accordingly, where "repairs" to the properties are referenced herein, the Court is referring to the elevation of the homes.

## II. STANDARD OF REVIEW

Although respondent's motion for remittitur was made in conjunction with a motion for a new trial, only the Court's ruling on the remittitur is the subject of this appeal. Because the motion for remittitur was raised in the context of a motion for a new trial, the Court will utilize the same standard of review applicable to a motion for new trial. *See Coleman v. Sopher,* 201 W.Va. 588, 605, 499 S.E.2d 592, 609 (1997). ("Remittitur typically arises in connection with a motion for a new trial, as it did in this case. Consequently, we will consider these issues together and apply the standard for reviewing a trial court's ruling on a motion for a new trial to our consideration."). In that regard:

> This Court reviews the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Burke-Parsons-Bowlby Corp. v. Rice*, 230 W.Va. 105, 736 S.E.2d 338 (2012). Moreover, "[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). With these standards in mind, we address the petitioners' assignments of error.

5

## III. DISCUSSION

In this appeal, petitioners invite the Court to create an exception to our long-standing rule regarding the measure of damages for tortious injury to real property as enunciated in Syllabus Point 2 of *Jarrett v. E. L. Harper & Son, Inc.,* 160 W.Va. 399, 235 S.E.2d 362 (1977):

> When realty is injured the owner may recover the cost of repairing it, plus his expenses stemming from the injury, including loss of use during the repair period. If the injury cannot be repaired or the cost of repair would exceed the property's market value, then the owner may recover its lost value, plus his expenses stemming from the injury including loss of use during the time he has been deprived of his property.

(emphasis added). This rule has remained relatively untouched since 1977 with regard to real property. Respondent incorrectly asserts, and the jury was incorrectly instructed, that *Jarrett* stands for the proposition that a plaintiff is entitled only to the lesser of cost of repair or diminution in value. While we acknowledge such is the general rule in a number of jurisdictions,[8] it is clear that such a construction is a misreading of *Jarrett* and pause here to clarify the import of *Jarrett* before proceeding further.

The rule expressed in *Jarrett* states that a plaintiff whose realty is injured is entitled to cost of repair plus expenses and loss of use. It is only where the injury cannot

---

[8] "[T]he general rule is that the plaintiff may recover the lesser of (1) the diminution in the property's fair market value, as measured immediately before and immediately after the damage; or (2) the cost to repair the damage and restore the property to its pretrespass condition, plus the value of any lost use." *Kelly v. CB & I Constructors, Inc.*, 102 Cal. Rptr.3d 32, 38 (Cal. Ct. App. 2009).

be repaired or where the cost of repair "exceed[s] the property's *market value*" that *Jarrett* limits the award to the property's lost value. Syl. Pt. 2, *Id*. (emphasis added). However, a close reading of *Jarrett* reveals that where cost of repair is in excess of diminution in value, but does not exceed the property's *market value* before the injury, the proper measure of damages under *Jarrett* is cost of repair.[9] Accordingly, it is the "ceiling" on repair damages in West Virginia that is squarely at issue in the case at bar. Each award of repair damages in the case at bar exceeds the fair market value of their homes prior to the flooding of May, 2011. Petitioners nevertheless argue that they should

---

[9] It is this subtle, but significant, variation from the "lesser of" general rule as expressed in other jurisdictions which has perhaps enabled the parties' misapprehension of West Virginia's rule on the proper measure of real property damages. As such, it is only when cost of repair exceeds fair market value that the "lesser of" rule is implicated under *Jarrett*. That is, where cost of repair is greater than fair market value, it is obviously greater than the diminution in value (which cannot exceed 100% of fair market value), and the plaintiff is therefore entitled to the "lesser" diminution in value.

We note, however, that our rule governing *personal* property reads differently and is more in keeping with respondent's characterization of *Jarrett*:

> As a general rule the proper measure of damages for injury to personal property is the difference between the fair market value of the property immediately before the injury and the fair market value immediately after the injury, plus necessary reasonable expenses incurred by the owner in connection with the injury. When, however, injured personal property can be restored by repairs to the condition which existed before the injury and the cost of such repairs is *less than the diminution of the market value due to the injury*, the measure of damages may be the amount required to restore such property to its previous condition.

Syl. Pt. 7, *Cato v. Silling*, 137 W.Va. 694, 73 S.E.2d 731 (1952) (emphasis added).

7

be entitled to recovery of their costs of repair despite the fact that such costs exceed their properties' fair market value prior to the flooding.

We consider the issues presented herein mindful that "no one measure of damages is likely to be appropriate to compensate for injury to all [] interests in realty" and that antiquated jurisprudence "generally assumed that a single, universal measure of damages for realty had to be devised, even if it failed to compensate adequately in many cases." *Board of Cnty. Comm'rs of the Cnty of Weld v. Slovek*, 723 P.2d 1309, 1316 n.6 (Colo. 1986) (quoting D. Dobbs, *Handbook on the Law of Remedies* § 5.1 at 311 (1973)). Moreover, "[t]he ultimate test of the fitness of a damage award is its capacity to advance the goal of tort damages, which is 'to make the injured party whole again.'" *American Serv. Ctr. Assoc v. Helton*, 867 A.2d 235, 242 (D. C. App. 2005) (quoting *Bell v. Westinghouse Elec. Corp.,* 507 A.2d 584, 555 (D.C. 1986)). As one court has aptly observed:

> The law of torts attempts primarily to restore the injured party to as good a position as he held prior to the tort. In accomplishing that result, courts must be mindful of the fact that rules governing the proper measure of damages in a particular case are guides only and should not be applied in an arbitrary, formulaic, or inflexible manner, particularly where to do so would not do substantial justice.

*Myers v. Arnold*, 403 N.E.2d 316, 321 (Ill. Ct. App. 1980) (citations omitted). With these principles in mind, we will proceed to examine the damages awards herein.

8

*Cost of Repair Damages*

As previously noted, petitioners assert that the circuit court erred in remitting their damages for the cost of elevating the homes and forcing them to accept only damages for the loss of value to their property. Petitioners maintain that to be made whole in this case, they must be awarded both cost of repair and the decrease in the value of their home. Although they acknowledge that the repair costs are in excess of the properties' pre-damage fair market value, petitioners assert they are entitled to restore their homes to their pre-flood status. In support of this argument, petitioners urge the Court to expressly adopt and apply the Restatement (Second) of Torts § 929 (1979), which would permit recovery of restoration costs where "there is a reason personal to the owner for restoring the original condition." Cmt. b. Section 929 of the Restatement provides:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for (a) the difference between the value of the land before the harm and the value after the harm, *or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred . . . .*

(emphasis added). Comment b to Section 929 defines this "appropriate case" by creating what has been called the "reason personal" exception:

> If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land[10] caused by the trespass, *unless there is a reason*

---

[10] The Restatement contains a lower benchmark for restoration damages—diminution in value—than the fair market value benchmark enunciated in *Jarrett*.

9

> *personal to the owner for restoring the original condition*,
> damages are measured only by the difference between the
> value of the land before and after the harm.

(emphasis added) (footnote added). The comment further states that "if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, *even though this might be greater than the entire value of the building.*" *Id.* (emphasis added).

While some jurisdictions have adopted the Restatement position to permit restoration damages in excess of diminution in value or the property's pre-damage fair market value, commentators have noted that "[t]he Restatement rule is exceedingly difficult to apply in some cases." D. Dobbs, Law of Remedies § 5.2(2), 719, 2d ed., (1993). Many of the courts adopting the Restatement have struggled to apply the rule in a consistent manner because it is so ambiguous. Regardless, the rationale underlying Section 929 of the Restatement is that where plaintiffs are forced to accept damages less than their actual cost of repair but wish to restore the property to its former condition, they are forced to partially pay out of pocket to effect such repairs and therefore are not truly made whole. *See Osborne v. Hurst*, 947 P.2d 1356, 1359 (Alaska 1997) ("[L]andowners should not be forced either to sell property they wish to keep or to make repairs partly out of their own pockets."). As the Illinois Court of Appeals noted,

> [a]llowing a plaintiff to recover the lesser of the cost of repair
> or the diminution in market value may be appropriate where
> the interest which has been harmed is purely financial, as
> where the land was purchased as a business investment with
> an eye towards speculation or where it is held solely for the

10

production of income. However, the same measure of damages may be painfully inadequate when the land is held for a personal use such as a family residence and the harm may be corrected with a reasonable expenditure even though the expenditure exceeds the amount the land has diminished in value.

*Myers,* 403 N.E.2d at 321; *see Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So. 2d 874, 880 (La. 1993) ("[I]f a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building."); *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1087-88 (Mont. 2007) ("If a plaintiff wants to use the damaged property, instead of selling it, restoration of the property constitutes the only remedy that affords a plaintiff full compensation. . . . '[T]he loss in market value is a poor gauge of damage' when the property gains its principal value from personal use rather than for pecuniary gain."); *Denoyer v. Lamb,* 490 N.E.2d 615, 619 (Oh. Ct. App. 1984) ("The parcels in question, being used for purposes personal to the owners, the damages should include amounts for repairs and restoration even though the market values of the parcels have not been decreased by the trespass and even though the award of damages may be greater than that value.").

In light of these considerations, we find that the rule articulated in *Jarrett* can, and in fact has been utilized in a fashion that renders inadequate compensation where residential property is damaged. By the same token, however, we do not feel constrained to the adoption of the Restatement's "reason personal" exception. Where a

11

plaintiff's primary residence is injured, it will seldom be the case that he would not be able to pay lip service to the "reason personal" exception, thereby entitling him to cost of repair even if he had no intention of repairing the property. The exception, as articulated, is empty noise and in practicality does little to further its stated goal of preventing a windfall or economic waste.[11] Even the Restatement notes that "[e]ven in the absence of value arising from personal use, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery." Cmt. b. It is only when cost of repair is "disproportionate to the diminution in the value of the land" that the Restatement would invoke the "reason personal" exception. *Id.* A "bright line rule" will benefits all parties in this type of litigation and provide an understandable guide for our trial judges.

To that end, we find that this Court is left to craft a rule which satisfies the compensatory objectives of tort law and is reflective of the public policy of this State. We find the kernel of that public policy in *Jarrett*, which makes clear that the measure of damages for injury to reparable property is, in fact, the cost of repair. Where property cannot be repaired, obviously, damages can only be measured by loss of value. However, in instances where the cost of repair exceeds the property's pre-damage market value,

---

[11] "If repair costs exceed diminished value, many owners will claim repair costs even if they intend to make no repairs at all, so that the 'windfall' problem may remain. And equally the economic waste problem may remain. If the owner insists on repairing a damaged house which only clutters the land and is worth nothing, the fact that his purpose is 'personal' will not eliminate the waste entailed in making repairs rather than adapting the land to its best purposes." Dobbs, *supra*, § 5.2(2) at 719.

12

*Jarrett* would compel the injured plaintiff to accept only the loss in value to the property. We find that this portion of our holding in *Jarrett* is no longer in accord with the modern recognition that cost of repair is often the only fair means of compensating the owner of damaged residential real property. *See Slovek*, 723 P.2d at 1316 (rejecting cap on restorative damages at diminution in value).

Moreover, we find a limitation on damages for cost of repair to the pre-damage market value unsatisfying as well. As the Montana Supreme Court observed, "[s]trictly capping the amount of restoration costs available to the pre-tort market value of the property . . . raises serious public policy concerns." *Sunburst*, 165 P.3d at 1089-90. The court explained further that

> [a] strict cap on restoration damages would equip the tortfeasor with the equivalent of a private right of inverse condemnation, or a power akin to a private right of eminent domain. . . A potential tortfeasor would have an incentive to disregard or discount risk of [injury] to neighboring property owners. Instead, a potential tortfeasor, armed with a power akin to a private right of eminent domain, could undertake any dangerous activity content with the knowledge that the damages from any harm that it may cause to a neighboring property, regardless of the cost of remediating the harm, would be limited to the market value of the neighboring property.

*Id*. at 1090. Like the Montana Supreme Court, we find it abhorrent to the public policy of this State to craft a rule that would place its citizens in a "'take it or leave it' proposition"—sell the homes that they do not want to leave in order to make themselves

13

whole again or continue to live with the consequences of the harm inflicted by a tortfeasor, which their damages are inadequate to repair. *Id.* As this Court has stated:

> [T]he aim of compensatory damages is to restore a plaintiff to the financial position he/she would presently enjoy but for the defendant's injurious conduct. In this manner, "[c]ompensatory damages indemnify the plaintiff for injury to property, loss of time, necessary expenses, and other actual losses. They are proportionate or equal in measure or extent to plaintiff's injuries, or such as measure the actual loss, and are given as amends therefor." "[T]he general rule in awarding damages is to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as money can do it, as he would have been [in] if . . . the tort [had] not [been] committed."

*Kessel v. Leavitt*, 204 W.Va. 95, 187, 511 S.E.2d 720, 812 (1998) (citations omitted).

We therefore hold that when residential real property is damaged, the owner may recover the reasonable cost of repairing it even if the costs exceed its fair market value before the damage. The owner may also recover the related expenses stemming from the injury, annoyance, inconvenience, and aggravation, and loss of use during the repair period. If the damage cannot be repaired, then the owner may recover the fair market value of the property before it was damaged, plus the related expenses stemming from the injury, annoyance, inconvenience, and aggravation, and loss of use during the time he has been deprived of his property. To the extent that Syllabus Point 2

14

of *Jarrett v. E. L. Harper & Son, Inc.*, 160 W. Va. 399, 235 S.E.2d 362 (1977) states otherwise, it is hereby modified.[12]

That is not to say, however, that there are no limitations on such an award. "Damages must be assessed in the manner ""'most appropriate to compensate the injured party for the loss sustained *in the particular case*[.]'""" *Kelly*, 102 Cal. Rptr.3d at 40 (quoting *Armitage v. Decker*, 267 Cal. Rptr. 399, 409 (Cal. Ct. App. 1990)). Like all compensatory damages awards, an award of cost of repair for injury to residential real property is still subject to review for reasonableness and excessiveness. Citing need for "practical good sense," most courts which have permitted recovery of cost of repair in excess of pre-injury market value, still require the award to be objectively reasonable in light of the diminution in value and/or pre-injury market value. *See Osborne*, 947 P.2d at 1360 (requiring cost of repair to be reasonable in light of diminution in market value); *Kelly*, 102 Cal.Rptr.3d at 39 ("[A]n award of such costs may be unreasonable as a matter of law if it is grossly disproportionate to the value of the property or the harm caused by the defendant."); *Slovek*, 723 P.2d at 1317 (cost of repair appropriate when "costs, although greater than original value, are not wholly unreasonable in relation to that value"); *Sunburst,* 165 P.3d at 1089 (noting "general rule" that reasonableness of an award of restoration damages is assessed against the market value of the property before

---

[12] With respect to non-residential real property, however, *Jarrett* is still controlling authority and we leave for another day the determination as to whether *Jarrett* should be revisited with respect to such properties.

the damage); 22 Am. Jur. 2d Damages § 278 (noting that cost of restoration must not be "unreasonable in relation to the damage inflicted and the value of the land prior to the tort."); *see also* Restatement (Second) of Torts § 929 cmt. b (limiting cost of repair only when it is "disproportionate" to diminution in value).

Recognizing that damages grossly in excess of a property's pre-damage market value smacks "uncomfortably" of economic waste, to accommodate our policy concerns of full compensation, any such award must be subject to reasonable limitations. Dobbs, *supra* § 5.2(1) at 715. *See Osborne*, 947 P.2d at 1360 ("The purpose for limiting an award to those costs that have been or may be reasonably incurred appears to be a desire to reduce the economic waste that occurs when a party incurs repair costs in excess of the diminished value of the property."). Therefore, to the extent that damages for cost of repair to residential real property exceed the fair market value of the property before it was damaged, damages awarded for cost of repair must be reasonable in relation to its fair market value before it was damaged. The measure of reasonable cost of repair damages is an issue for the trier of fact, but may be found to be unreasonable as a matter of law if unreasonably disproportionate to the fair market value of the property prior to the damage. *See Kelly*, 102 Cal. Rptr.3d at 39 ("Whether the restoration costs are reasonable is a question for the trier of fact in the first instance[.]") Therefore, we find that the circuit court erred in remitting the cost to elevate the properties from the jury's award and hereby reinstate those damages as contained on the jury verdict form.

16

*Residual Diminution in Value*

Having determined that petitioners may recover the cost of repair to their homes, we must now address whether the jury's award for diminution of value survives. Petitioners assert that not only are they entitled to recover cost of repair, but are also entitled to recover damages for the "present diminished value" of their homes. Petitioners suggest that West Virginia law does not require a plaintiff to be subjected to the "false choice" of damages for repair or loss of value.

We begin by noting that neither common sense, nor our former holding in *Jarrett* would permit recovery of *both* cost of repair and gross loss of value, as such a recovery is generally duplicative: "The reason for the mutual exclusivity of damages to compensate for repair costs and gross diminution in value is that they overlap (the first being a component of the second), and to award both would overcompensate the plaintiff." *Helton*, 867 A.2d at 242; 121 Am. Jur POF3d 359 § 7 at 383.

However, to whatever extent such damages are not duplicative of one another, the goal of ensuring adequate compensation for injury to real property requires the Court to consider the propriety of such an award just as this Court did in *Ellis v. King*, 184 W.Va. 227, 400 S.E.2d 235 (1990). In *Ellis*, the Court created an exception to the general rule permitting only cost of repair or diminution in value for motor vehicles which were structurally damaged and continued to suffer a residual loss of value even after they were repaired. Syllabus Point 2 of *Ellis* states:

17

> If the owner of a vehicle which is damaged and subsequently repaired can show a diminution in value based upon structural damage after repair, then *recovery is permitted for that diminution in addition to the cost of repair*, but the total shall not exceed the market value of the vehicle before it was damaged.

(emphasis added). This holding is now the majority rule nationwide with respect to personal property. The rationale behind permitting this variation from the general rule is that "residual" diminution in value is not duplicative of the cost of repair, *i.e.* the property still has lost value even after it is repaired. The *Ellis* Court explained that unlike in *Jarrett*, where the property was "in as good condition as it was before the injury," 160 W. Va. at 404, 235 S.E.2d at 365,

> [s]uch is not the case in situations involving structural damage to vehicles. Once structural damage occurs, often no amount of repair can return the vehicle to its condition prior to the accident and consequently, to the value it had prior to the injury. We do not believe that the general rule which equates recovery with cost of repair is applicable where the vehicle cannot be repaired to its condition prior to the injury.

184 W. Va. at 229-30, 400 S.E.2d at 237-38. Petitioners urge this Court to extend the *Ellis* rule to real property and allow them to recover both the cost of raising the foundations (repair) *and* the damages awarded by the jury for loss of value.

Although permitting an award of damages for residual diminution in value is a well-accepted rule with regard to personalty, we likewise find support for application of a similar rule where real property is injured. In *Wade v. S. J. Groves & Sons Co.*, 424 A.2d 902, 911 (Pa. Super. 1981), the court permitted recovery for both cost of repairs and

18

residual diminution in value where a permanent change in a drainage field above the plaintiffs' property created a depreciation in the subject property despite the fact that repairs had corrected "most of the problem" caused by negligent filling of an adjacent gully. The court noted that plaintiffs' expert testified that "a prospective buyer who was informed of the history of the property would pay less for the property than he would otherwise have been willing to pay, due to the possibility, albeit remote, of another slide and because of the necessity of regularly maintaining the drainage pipes, ditches and catch basins in repair over the years." *Id*. The court found no error in the "allowance of damages for the cost of repairs in addition to the reduction in the fair market value of the property where the injury to such property is partially reparable and partially permanent." *Id*. at 911.

Similarly, in *Nashua Corp. v. Norton Co*., 1997 WL 204904, at *6 (N.D.N.Y. April 15, 1997), the United States District Court for the Northern District of New York agreed that "'[w]here the repairs do not restore the property to its condition before the accident, the difference in market value immediately before the accident and after the repairs have been made may be added to the cost of repairs.'" (citing *Johnson v. Scholz*, 93 N.Y.S.2d 334, 336 (1949)). The court found that the general rule that a plaintiff may only recover cost of repair or diminution in value "applies only when property can be restored to its pre-accident condition through remediation." *Id*.

19

Moreover, in *Hartzell v. Justus Co., Inc.*, 693 F.2d 770, 775 (8th Cir. 1982), the court permitted recovery of both cost of repair as well as alleged residual depreciation in market value: "There was no double recovery here: the verdict was not for the cost of repair plus the *entire* decrease in market value, but rather for cost of repair plus the decrease in market value that still existed after all the repairs had been completed." *See Mehlenbacher v. Akzo Mobel Salt, Inc.,* 71 F. Supp.2d 179, 190-91 (W.D.N.Y. 1999) (noting authority that both cost of repair and "remaining, irreparable damage to property" causing diminution of value are proper awards "where the property cannot be fully restored by repairs, which is consistent with the purpose of such damages, which is to make the plaintiff whole."); *Helton*, 867 A.2d at 242 ("[R]esidual diminution in value does not duplicate the cost of repair because it is calculated based on a comparison of the value of the property before the injury and *after* repairs are made, *i.e.* excluding injury compensated by damages for the cost of repair."); *John Thurmond & Assoc., Inc. v. Kennedy*, 668 S.E.2d 666, 669 n.2 (Ga. 2008) ("Although unusual, it may sometimes be appropriate, in order to make the injured party whole, to award a combination of both measures of damages. In such cases, notwithstanding remedial measures undertaken by the injured party, there remains a diminution in value of the property, and an award of only the costs of remedying the defects will not fully compensate the injured party."); *Morris v. Ciborowski*, 311 A.2d 296, 299 (N. H. 1973) (upholding award of diminution in value where such award "did not include . . . but was in addition thereto" cost of repair); *Anderson v. Plains Engineering, Inc.*, 681 P.2d 1316, 1324 (Wyo. 1984) (citations omitted) ("Where the damage is to a dwelling house used for the personal purpose of the

20

owner, it may be just that recovery be had for the amount of the repairs, even though that exceeds the entire value of the building; the diminished value of the property, because of a public awareness of a water problem, is also recoverable, that damage being measured as of the date of the injury."); 121 Am. Jur. POF3d 359 § 7 at 383 ("[W]here the plaintiff can establish that damages recovery under both approach would not lead to a 'double recovery' in whole or in part, the plaintiff may pursue both.").

Certainly a scenario where damaged residential real property maintains a residual loss of value after repairs are effected is conceivable. In the instant case, there was expert testimony that the neighborhood had "died" and that even if no further flooding occurred, the market in the neighborhood would not recover. Such residual loss of value is closely akin to so-called "stigma damages" which are common in environmental contamination cases.[13] The Court can perceive of no reason why such damages, to the extent they are not duplicative of any other element of damage, should not be recoverable by an injured plaintiff. Therefore, where the owner of residential real property which is damaged can establish that the pre-damage fair market value of the residential real property cannot be fully restored by repairs and that a permanent,

---

[13] *See Walker Drug Co., Inc. v. La Sal Oil Co.,* 972 P.2d 1238, 1246 (Utah 1998) ("A majority of courts from other jurisdictions, however, allows recovery when a defendant's trespass or nuisance has caused some temporary physical injury to the property but, despite the temporary injury's remediation, the property's market value remains depressed. Thus, stigma damages compensate for loss to the property's market value resulting from the long-term negative perception of the property in excess of any recovery obtained for the temporary injury itself." (citations omitted)).

21

appreciable residual diminution in value will exist even after such repairs are made, then the owner may recover both the cost of repair and for such remaining diminution in value.

However, we admonish the lower courts to assess a claim for this newly-recognized element of residential property damage with guarded scrutiny before submitting it to the jury. It is only in the extraordinary case that repair of damaged residential real property will not fully restore its prior market value. Mere cosmetic damage, speculative decreased future market value, or damage which can be readily and fully remediated are an insufficient foundation for a claim of residual diminution in value. The trial court must ensure that, particularly where cost of repair exceeds the property's fair market value before the damage, any claim for residual diminution in value is "truly and reasonably necessary to achieve the cardinal objective of making the plaintiff whole." *Slovek*, 723 P.2d at 1317.

Applying this holding to the facts of the instant case, however, yields no clear result from the record in this case. There was testimony of property damages recovered because of previous floods and diminution in value from these floods. There was further damage from flooding in the instant case. While there was testimony to the effect that the market value of the properties would not recover even if no future flooding occurred, it is wholly unclear whether the figures propounded by petitioners' expert were for total diminution of value or residual loss of value after the properties are elevated.

22

We therefore vacate the jury's award for diminution in value of petitioners' homes and remand for further proceedings as appropriate for determination of the amount of any *residual* diminution of value to the subject properties after the repairs are completed, if any.[14]

## IV. CONCLUSION

For the reasons set forth above, this Court reverses the August 29, 2013, order of the Circuit Court of Wayne County granting respondent's motion for remittitur and reinstates the jury's award of damages for the cost to raise petitioners' homes. Inasmuch as neither petitioner nor respondent appealed the remainder of the jury's verdict for personal property damage, cost to repair HVAC, and annoyance, inconvenience, and loss of use, the jury's verdict for those additional damages are unaffected by this opinion. However, we vacate the jury's award for "lost value of home" to each petitioner and remand this case for further proceedings as appropriate solely for determination of the residual diminution of value to the subject properties, as set forth herein.

Reversed; vacated and remanded.

---

[14] Because of our disposition herein, it is unnecessary to address petitioners' final assignment of error asserting that the circuit court erred in summarily remitting the verdict without providing petitioners the option of a new trial.

23