**STATE OF WEST VIRGINIA**

**Jacklyn Clutter,**
**Defendant Below, Petitioner**

**vs.)  No. 20-0355** (Greenbrier County 18-C-108)

**Joe Sharp and David Sharp,**
**Plaintiffs Below, Respondents**

**FILED**

**March 23, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Jacklyn Clutter, by counsel Jeffry A. Pritt, appeals the April 10, 2020, order of the Circuit Court of Greenbrier County directing that property owned by the parties be partitioned by allotment. Respondents Joe Sharp and David Sharp, by counsel Kristopher Faerber, filed a response in support of the circuit court's order. Jacklyn Clutter filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

This case is one of a series of disputes between siblings Jacklyn Clutter and Joe Sharp. David Sharp is the father of Jacklyn Clutter and Joe Sharp. David Sharp has dementia, and he has appeared in this action by Joe Sharp, his attorney-in-fact, pursuant to a durable power of attorney.

In 1993, Jacklyn Clutter and her husband purchased a two-bedroom single-family residence at 464 Matthews Road in Ronceverte, West Virginia, for $48,000.00. Thereafter, Jacklyn Clutter lived in the home with her husband and daughter. Sometime in the late 1990s or early 2000s, Jacklyn Clutter and Joe Sharp's parents moved into the home. Subsequently, their mother died, Jacklyn Clutter divorced her allegedly abusive husband, and everyone moved out of the home except David Sharp. Although the parties dispute the exact year, it is undisputed that Jacklyn Clutter moved out of the home no later than 2000.

On September 8, 2003, the property was conveyed by deed to the three parties in this case as joint tenants with a right of survivorship. On March 19, 2004, the parties refinanced the existing mortgage on the home, obtaining a loan for $36,219.66. Nine years later, David Sharp paid off the remainder of the balance on the loan. It is undisputed that Joe Sharp paid no amount for his interest

1

in the property, nor did he make any payments on the loan. Jacklyn Clutter paid the real estate taxes on the property from 2005 through 2016 in an amount totaling $1,667.95. Thereafter, Joe Sharp paid the real estate taxes.

David Sharp lived in the home until he was unable to live alone due to dementia. He was ultimately moved to a nursing home. His nursing home expenses are paid with his Social Security income and West Virginia Medicaid.

Around 2018, Joe Sharp rented the vacant home to tenants. Joe Sharp did not obtain Jacklyn Clutter's permission to rent the home. The utilities, which had been in Jacklyn Clutter's name, remained in her name. In preparing the home for the tenants, Joe Sharp moved personal property belonging to Jacklyn Clutter out of the home, placing it in an outbuilding on the property and under a tarp on the ground outside the home. When the tenants moved into the home, the water heater in the home was damaged, causing a substantial leak that was not timely discovered. Joe Sharp replaced the damaged water heater at a cost of $800.00, but not before $3,160.91 in charges had accrued on the water bill in Jacklyn Clutter's name. Jacklyn Clutter successfully pursued an eviction action against the tenants.

While Jacklyn Clutter was prosecuting her eviction action, Joe Sharp commenced a separate action to evict her from a home in "Clutter holler." Then, on July 10, 2018, Joe Sharp obtained a $10,000.00 judgment against Jacklyn Clutter in the Magistrate Court of Greenbrier County.[1] Upon her eviction from "Clutter holler," Jacklyn Clutter moved into the home at 464 Matthews Road. Jacklyn Clutter also obtained a protective order against Joe Sharp.

On August 28, 2018, Joe and David Sharp filed a complaint against Jacklyn Clutter, seeking partition of the property at 464 Matthews Road by either allotment of the property to them or sale of the property, with the proceeds of the sale to be distributed among the three parties. Through her amended answer, Jacklyn Clutter asserted a counterclaim, alleging she was entitled to damages for the costs she incurred in evicting the tenants from the property, for damage to the home and her personal property, and for utility charges incurred by the tenants in her name.

On November 4, 2019, Joe and David Sharp filed a petition for determination of liens, arguing that the $10,000.00 civil judgment obtained against Jacklyn Clutter constituted a lien held by Joe Sharp against Jacklyn Clutter pursuant to West Virginia Code § 37-4-4.[2] Thereafter, by order entered on January 10, 2020, the circuit court determined that Joe and David Sharp were entitled to the partition of the property and that the property was not capable of being partitioned

---

[1] The civil judgment accrued interest at a rate of 4.5% per year.

[2] West Virginia Code § 37-4-4 provides:

> When there are liens by judgment or otherwise, on the interest of any party to a partition suit, the court may, on the petition of any person holding a lien, ascertain the liens and apply the dividend of such party in the proceeds of sale to the discharge of such liens so far as may be necessary for that purpose.

in kind. Commissioners were appointed to appraise the property, and pursuant to their report, the property had an estimated market value of $40,000.00. The parties did not object to the appraisal.

The case proceeded to a bench trial on January 10, 2020. The circuit court heard testimony from Joe Sharp and Jacklyn Clutter. Joe Sharp testified that since Jacklyn Clutter had moved back into the home, she had caused damage to it. He claimed that if the circuit court did not order allotment and if Jacklyn Clutter were permitted to remain in the home, the value of David Sharp's interest in the home would decrease. Joe Sharp admitted that he had removed some of Jacklyn Clutter's personal property from the home and placed it in an outbuilding and in the yard under a tarp.

Jacklyn Clutter testified that she paid $2,500.00 in attorney's fees to have the tenants evicted. She stated that when she moved into the property, she discovered that the tenants had caused significant damage to the walls and carpets. She presented an estimate from JABA Company Construction indicating that the cost of repairing the damage would be $11,182.00. She also testified that various items in the home, including appliances, furniture, and pots and pans, had been damaged by the tenants, and she estimated that the value of this property before being damaged was $6,390.00. She went on to claim that Joe Sharp damaged her personal property when he removed it from the home. She stated that the personal property Joe Sharp placed under the tarp in the yard had a value of $2,000.00 before it was destroyed. She also testified that furniture Joe Sharp placed in an outbuilding had a value of $3,700.00 before it was destroyed. She did admit, however, that until 2018, she had not lived in the home for about eighteen years. She also stated that while her father lived in the home, he always wore his shoes in the home, smoked cigars in the home, and collected considerable personal property that he stored in and around the home. She testified that she paid the real estate taxes on the property from 2005 through 2016 in an amount totaling $1,667.95.

Through her testimony, Jacklyn Clutter attempted to explain how and why Joe and David Sharp had been made co-owners of the property. She said:

> I wanted to – when I moved my mom and my dad in with me, the reason why [I] did it, 'cause I was never at home. So, I thought I wouldn't get beaten as much. But it continued. And so nobody knows when they're going to die, so I went and met with Doug Fisk at the bank, First National then. And I told Doug – I said, I want my dad's name on the deed 'cause I moved them in. I was responsible for them. . . . And I know it was dirty of me, but I needed one more person so my parents would own more of a share because my husband never even took care of his own daughter. And, so, I put Joe Sharp's name on there at the understanding that it was just to protect – and my parents owned more share of the house.
>       . . . .
>       . . . If [my ex-husband] would've killed me during a beating, I believe that would've held up in court of my dad, you know, and Joe getting more money out of the share and [my ex-husband] getting less if something happened to me because they own more percentage.
>       . . . .
>       . . . [W]hen we divorced, I just had to pay my ex-husband a percentage, not

3

half, like you would pay if you were keeping the property because I already had daddy's name and Joe Sharp's names there.

However, Jacklyn Clutter's counsel disputed her testimony, stating that the available documentary evidence showed that Joe and David Sharp were not placed on the deed to the property until 2003, which was after Jacklyn Clutter's divorce. Jacklyn Clutter also claimed that she did not need Joe or David Sharp to refinance the home in 2004 because she had good credit at the time. She admitted that as of the bench trial her credit was poor and that she could not purchase Joe and David Sharp's interests in the property, but she claimed she had "someone that's getting a line of credit for me to purchase[] Matthews."

The circuit court entered its final order on April 10, 2020. With regard to the counterclaim, the circuit court determined that Joe Sharp was liable for Jacklyn Clutter's destroyed property under the tarp in the amount of $2,000.00, that Joe Sharp was liable for the water bill resulting from the leak, which totaled $3,160.91, but that Joe and David Sharp were not liable for the remaining damages sought by Jacklyn Clutter because she failed to present sufficient evidence of those damages.

The circuit court found that Jacklyn Clutter and Joe Sharp "cannot peaceably retain joint ownership of the property." Accordingly, it ordered that the property be partitioned by allotment pursuant to West Virginia Code § 37-4-3.[3] Finding that David Sharp would receive economic benefit from allotment of his interest in the property to Joe Sharp, and finding that Joe Sharp "is the only party who has the financial ability to acquire the property by allotment," the circuit court ordered that the interests of Jacklyn Clutter and David Sharp be allotted to Joe Sharp. The circuit court determined that, based on the appraisal valuing the property at $40,000.00, each party's one-third interest was $13,333.33. Upon taking into account the parties' liabilities, including Joe Sharp's liability for the damage to Jacklyn Clutter's personal property, Joe Sharp's liability for the water bill, and the civil judgment obtained by Joe Sharp against Jacklyn Clutter then totaling $10,778.98, the circuit court determined that Joe Sharp must pay $12,279.70 to David Sharp and $6,661.61 to Jacklyn Clutter for their respective interests in the property.

Jacklyn Clutter now appeals the circuit court's April 10, 2020 order. Through her three assignments of error, she argues that the circuit court erred by failing to award her the damages she asserted in her counterclaim and by allotting the entirety of the property to Joe Sharp. Because the circuit court decided this case following a bench trial, we apply the following standard of review:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed

---

[3] West Virginia Code § 37-4-3 provides, in relevant part, "When partition cannot be conveniently made, the entire subject may be allotted to any party or parties who will accept it, and pay therefor to the other party or parties such sum of money as his or their interest therein may entitle him or them to[.]"

4

under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Public Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

We begin our analysis by considering Jacklyn Clutter's first assignment of error. Therein, she argues that the circuit court awarded her an insufficient sum in ruling on her counterclaim. We note that the circuit court gave her credit for $5,160.91, which represented the value of the destroyed property under the tarp and the outstanding water bill. She claims she is entitled to an additional $25,439.95 for the alleged damages to the home, appliances, personal property inside the home, and personal property in the outbuilding; for the attorney's fees she spent to evict the tenants; and for the sum of the real estate taxes she spent on the home. She argues that she proved all her damages through her detailed testimony and the estimate produced by JABA Company Construction. She further asserts that her evidence was unrebutted by Joe Sharp and that the circuit court failed to explain why her evidence was insufficient to prove her damages.

Jacklyn Clutter cites to *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998), in support of her position that she is entitled to the compensatory damages she seeks. In *Kessel*, we said:

Primarily, the aim of compensatory damages is to restore a plaintiff to the financial position he/she would presently enjoy but for the defendant's injurious conduct. In this manner, "[c]ompensatory damages indemnify the plaintiff for injury to property, loss of time, necessary expenses, and other actual losses. They are proportionate or equal in measure or extent to plaintiff's injuries, or such as measure the actual loss, and are given as amends therefor." 5C Michie's Jur. *Damages* § 7, at 46–47 (1998) (footnotes omitted). "[T]he general rule in awarding damages is to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as money can do it, as he would have been [in] if ... the tort [had] not [been] committed." 5C Michie's Jur. Damages § 18, at 63 (footnote omitted).

*Id.* at 187, 511 S.E.2d at 812. She also cites to *Brooks v. City of Huntington*, 234 W. Va. 607, 768 S.E.2d 97 (2014), in which we held:

When residential real property is damaged, the owner may recover the reasonable cost of repairing it even if the costs exceed its fair market value before the damage. The owner may also recover the related expenses stemming from the injury, annoyance, inconvenience, and aggravation, and loss of use during the repair period.

*Id.* at Syl. Pt. 4, in part.

We have recognized, however, that a party who claims to have been damaged by another is not automatically entitled to compensation. "Normally, the plaintiff in a tort action is required to prove both the defendant's liability and the damages he or she has suffered as a result of the

defendant's wrongdoing." *Lively v. Rufus*, 207 W. Va. 436, 446, 533 S.E.2d 662, 672 (2000); *see also* Syl. Pt. 8, *Miller v. United Fuel Gas Co.*, 88 W. Va. 82, 106 S.E. 419 (1921) ("In an action for tort, the plaintiff bears the burden of proof . . . . The evidence must generate an actual, rational belief in the existence of the disputed fact."). In this case, Jacklyn Clutter relies almost exclusively upon her own testimony to prove the amount of the damages she suffered. She also relies exclusively upon her own testimony to establish that her damages were caused by Joe Sharp. Thus, her credibility was a primary factor for the circuit court to consider and weigh in ruling on this matter. "Ordinarily, this Court will defer to credibility determinations made by a trial court[.]" *Ware v. Howell*, 217 W. Va. 25, 28, 614 S.E.2d 464, 467 (2005).

Upon our thorough review of the appendix record, we find that Jacklyn Clutter is not entitled to an additional $25,439.95 in damages because she did not produce sufficient proof of those damages. With regard to the alleged damages to the home, the appliances, and the personal property in the home, we find that Joe Sharp presented testimony indicating that those damages may have been caused, at least in part, by Jacklyn Clutter herself and/or David Sharp. Because the only evidence of the cause of those damages and the alleged damages to the personal property in the outbuilding was presented exclusively through the siblings' testimony, the circuit court was required to weigh the credibility of each sibling in reaching its decision. The circuit court clearly found that Jacklyn Clutter's credibility was lacking. This Court has no reason to second guess the circuit court's apparent credibility determinations on appeal, particularly in light of the fact that Jacklyn Clutter's dubious testimony was, at one point during the bench trial, contradicted by her own counsel.

Similarly, the only evidence of the extent of the damage to the appliances and personal property and the replacement value of these items was Jacklyn Clutter's own testimony. She produced no appraisals, estimates, receipts, or testimony from other witnesses to corroborate her claims. Again, it is evident that the circuit court made a credibility determination in reaching its decision, and we will not second guess that decision now. The evidence was insufficient to support Jacklyn Clutter's claim for damages to the home, the appliances, the personal property in the home, and the personal property in the outbuilding.

Moreover, despite her contention to the contrary, Jacklyn Clutter failed to prove below that she was entitled to $2,500.00 in attorney's fees. We observe that the only evidence presented as to whether she incurred attorney's fees and the amount of any such fees was through her own testimony. She presented no contract, receipt, or testimony from another witness that might corroborate her claim. Once again, it is evident from the record that the circuit court made a credibility determination in reaching its decision as to these alleged damages, and we see no reason to question that determination now. Therefore, we conclude that the evidence presented was insufficient to maintain her claim for attorney's fees.

We further find that Jacklyn Clutter failed to prove that she was entitled to reimbursement for the entirety of the $1,667.95 in taxes she paid on the property. We note that she seeks reimbursement for *all* the taxes paid between 2005 and 2016 despite owning a one-third interest in the property during that time. Additionally, at no point between 2005 and the date this lawsuit was filed did she seek reimbursement for any amount of the taxes she paid. While she asserts that the circuit court should "be held to account for . . . her request for reimbursement for numerous

6

years of real estate taxes that were paid solely by her," she has argued no legal basis in support of her claim that she is entitled to such reimbursement, nor has she cited to any law in support of her position. We have repeatedly recognized that "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs." *State, Dep't of Health and Human Res. ex rel. Robert Michael B. v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Consequently, Jacklyn Clutter has failed to demonstrate that she was entitled to reimbursement for the taxes she paid. Accordingly, we conclude that the circuit court did not abuse its discretion in determining the amount of damages to which Jacklyn Clutter was entitled.

We next consider Jacklyn Clutter's second and third assignments of error, through which she argues that the circuit court erred by allotting the property, in its entirety, to Joe Sharp. She argues that pursuant to *Alderson v. Horse Creek Land Co.*, 81 W. Va. 411, 94 S.E. 716 (1917), and *Ward v. Ward's Heir*, 40 W. Va. 611, 21 S.E. 746 (1895), the property should have been allotted to her. She asserts that the circuit court failed to consider the fact that Joe Sharp had invested no money in the property aside from replacing the water heater, that Joe Sharp never lived on the property, and that Joe Sharp was only placed on the deed to provide "extra security" for David Sharp should something happen to her. She also contends that the circuit court erred by allotting David Sharp's interest to Joe Sharp, stating that by seeking David Sharp's interest in the property, Joe Sharp violated a statutory duty owed to David Sharp as his attorney-in-fact by "changing the manner in which this property was to descend at [David Sharp]'s passing." She claims that under the equities of the case, Joe Sharp's interest should have been allotted to her and that David Sharp should have retained his interest in the property.

We find that Jacklyn Clutter's position is without merit and that the cases she cites have little bearing on the facts of this case. In *Alderson*, the Court considered the equitable partition of a piece of property upon which one of two cotenants made improvements. The Court held that the property should be partitioned in a way that would permit the cotenant who made the improvements to take the portion of the property with his improvements, but only if such partition would do no injustice to the other cotenant. *See id.* at Syl. Pt. 2 ("The fact that a cotenant has located upon a particular portion of the land of the cotenancy, and has enhanced its value by making improvements is a circumstance always deemed worthy of consideration by a court charged with the duty of making partition; and if in making such partition the part so improved can be assigned to the cotenant making the improvement without doing injustice to the other cotenant, such assignment will be made. It is the duty of the court making such a partition to cause the improvements to be assigned to the respective parties who make them, so far as it can be done consistently with an equitable partition of the estate.") This holding, however, is only instructive in the case presently before the Court to the extent that it stands for the general proposition that courts should consider the equities when dividing jointly owned property pursuant to West Virginia Code §§ 37-4-1 to -9. To any other extent, *Alderman* is unenlightening as its facts have little in common with those of the case at bar.

*Ward* is similarly uninstructive. In *Ward*, the Court considered the equitable partition of a piece of property upon which one of several coparceners made improvements. The Court held, "In partition the part improved, if it can be done without injury to others, should be assigned to the

improver; but, where this cannot be done, the cost of improvement cannot be charged to him to whom it goes." *Id*. at Syl. Pt. 6.

> Where, however, the property is not susceptible of partition, and must be sold to divide the proceeds, the coparcener who made repairs and permanent improvements shall receive out of the proceeds that amount by which the property, at the date of sale, remains enhanced in value from the improvements, not their original cost.

*Id.* at Syl. Pt. 7. Because Jacklyn Clutter's case involves neither partition by sale nor questions concerning the value of improvements to the property, *Ward* gives no guidance on the proper allotment of the property here.

We conclude that, under the equities of this case, the circuit court made the correct decision in choosing not to allot Joe Sharp's interest to Jacklyn Clutter. It was established during the bench trial that a $10,000.00 civil judgment was pending against her, that she had poor credit, that she did not have the financial ability to purchase Joe Sharp's interest, and that the only way she could obtain the funds to purchase Joe Sharp's interest was her vague assertion that she had "someone that's getting a line of credit for me." The evidence supports the circuit court's conclusion that Joe Sharp was the only party with the ability to purchase the other parties' interests in the property.

Furthermore, we find that the circuit court's decision to allot David Sharp's interest to Joe Sharp was not made in error. Jacklyn Clutter argues that, by asking the circuit court to allot David Sharp's interest to him, Joe Sharp failed to preserve his principal's estate plan under West Virginia Code § 39B-1-114(b).[4] She states that

> [t]he existing deed for this parcel – which names the parties hereto as joint tenants with right of survivorship – has been in place since 2003. Presumably, David Sharp agreed with the likely disposition of his interest in the real estate to his two children (as his survivors) since he never took any action to do anything differently. In other words, this was basically his estate plan for this interest in the real property.

She also asserts that a payment to David Sharp for his interest will render him ineligible for Medicaid benefits until the payment is spent down, ultimately resulting in a waste of the asset.

---

[4] West Virginia Code § 39B-1-114(b) provides, in relevant part:

> [A]n agent who has accepted appointment [to act for a principal under a power of attorney] shall:
>
> . . . .
>
> (6) Attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest based on all relevant factors, including:
>
> . . . .
>
> (D) Eligibility for a benefit, a program or assistance under a statute or regulation.

We find that given the ongoing animosity between Jacklyn Clutter and Joe Sharp, the circuit court's decision to allot David Sharp's interest to Joe Sharp was appropriate. Jacklyn Clutter states that she "proposed to the lower court that she be allotted Joe Sharp's interest in the property . . . and that she and her father then continue to hold [the property] thereafter as joint tenants with right of survivorship." However, this scenario would have been untenable because Jacklyn Clutter was unable to afford Joe Sharp's interest. Moreover, contrary to her claim that her proposal would have "honored her father's apparent intentions," we find that her proposed allotment would not have resulted in the equal division of that interest between her and Joe Sharp upon David Sharp's death, presuming both children survive him. Rather, as the sole joint tenant, Jacklyn Clutter would receive the entirety of David Sharp's interest. We find that the circuit court's allotment of David Sharp's interest impacts Jacklyn Clutter and Joe Sharp equally and ensures that the siblings will avoid future disputes over ownership of the property. Under the circumstances of the case, it is apparent that the circuit court made the best decision for all parties involved. Therefore, we conclude that the circuit court did not abuse its discretion by allotting the interests of Jacklyn Clutter and David Sharp to Joe Sharp.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** March 23, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

9