Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/13/2026 08:08 AM CDT

Helzer Farms, LLC, appellant, v. Jason Allington
and Allington Farms, LLC, appellee.

___ N.W.3d ___

Filed March 13, 2026.    No. S-24-826.

1. **Courts: Judgments: Appeal and Error.** In appeals from the district court sitting as an appellate court, the immediate question is whether the district court erred in its appellate review of the county court's decision, but review of that question necessarily involves considering the decision of the county court.

2. **Courts: Appeal and Error.** A judgment rendered by the county court is reviewed for error appearing on the record.

3. **Judgments: Appeal and Error.** When reviewing a judgment for error appearing on the record, the inquiry is whether the decision conforms to law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

4. ____: ____. Whether a decision conforms to law is, by definition, a question of law, to which an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.

5. **Evidence: Words and Phrases.** Competent evidence is evidence that is admissible and tends to establish a fact in issue.

6. **Words and Phrases.** A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis that would lead a reasonable person to the same conclusion. A capricious decision is one guided by fancy rather than by judgment or settled purpose. The term "unreasonable" can be applied to a decision only when the evidence presented leaves no room for differences of opinion among reasonable minds.

7. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, and an appellate court will not disturb those findings unless they are clearly erroneous.

8. **Property: Damages.** An owner of residential or recreational land may recover as damages the costs of reasonable restoration of the property to its preexisting condition or to a condition as close as reasonably feasible.

9. \_\_\_\_: \_\_\_\_. The purpose of restoration cost damages is to restore the property to its preexisting condition or to a condition as close as reasonably feasible.

10. \_\_\_\_: \_\_\_\_. Restoration cost damages are distinct from replacement cost damages. The purpose of restoration cost damages is to restore the property to its prior use, not to compensate for a direct replacement.

Appeal from the District Court for Gage County, Ricky A. Schreiner, Judge, on appeal thereto from the County Court for Gage County, Jeffrey A. Gaertig, Judge. Judgment of District Court affirmed.

Stephen D. Mossman and Andrew R. Spader, of Mattson Ricketts Law Firm, L.L.P., for appellant.

Charles E. Wilbrand and Anthony M. Budell, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Per Curiam.

## I. INTRODUCTION

Helzer Farms, LLC, appeals from the district court's affirmance of the county court's judgment in favor of Jason Allington (Jake) and Allington Farms, LLC (collectively Allington), on Allington's counterclaim for trespass. Helzer Farms' challenge on appeal predominantly concerns our opinion in *Keitges v. VanDermeulen*[1] and the applicability, measure, and amount of restoration cost damages awarded for the destruction of a natural-growth treed area on Allington's property. Ultimately, we determine that the district court did not err in affirming the judgment of the county court. We affirm.

---

[1] *Keitges v. VanDermeulen*, 240 Neb. 580, 483 N.W.2d 137 (1992).

## II. BACKGROUND

After constructing a division fence, Helzer Farms brought a statutory action for contribution under Neb. Rev. Stat. § 34-112.02 (Cum. Supp. 2024) against Allington. Allington pleaded a counterclaim for trespass and sought damages primarily for the resulting destruction and removal of trees on Allington's property. After a bench trial, the county court entered judgment in favor of both parties on their claims.

Helzer Farms appealed to the district court.[2] Upon its review, the district court affirmed the judgment of the county court.[3] Helzer Farms now appeals from the district court's judgment affirming the judgment of the county court.[4]

We first review the evidence adduced at trial before detailing the judgment of the county and district courts.

### 1. Helzer Farms' Trespass

Nick Helzer (Nick) purchased farmland in Gage County, Nebraska, in May 2021. He described the land as his "dream farm." Subsequently, he created Helzer Farms and transferred ownership of the farmland to it. Beginning before and continuing after Nick's purchase of the farmland, he began the process of constructing a "hog-wire" division fence on all the property lines, and a road around the entirety of the farmland immediately inside the fence. In preparation for the installation of the fence and the construction of the road, Helzer Farms' contractors needed to clear all vegetation from the borders of the farmland, including along the farmland's southern property line, which abuts Allington's property.

Allington's property was originally owned by Jake's great-grandfather. Jake inherited the property upon his father's death in 2018. After Helzer Farms' trespass and before

---

[2] See Neb. Rev. Stat. §§ 25-2728 to 25-2732 (Reissue 2016 & Cum. Supp. 2024).

[3] See Neb. Rev. Stat. § 25-2733 (Reissue 2016).

[4] See Neb. Rev. Stat. § 25-1911 (Reissue 2016).

trial, Jake transferred the property to the then-newly created Allington Farms.

At trial, it was undisputed that Helzer Farms' contractors trespassed onto Allington's property while they were clearing the southern borderline of Helzer Farms' farmland. In doing so, the contractors removed trees and other vegetation from Allington's property. Thereafter, when Helzer Farms' contractors were installing the property division fence, more trees were removed from Allington's property.[5] These are the harms for which damages remain at issue on appeal.

Specifically at issue are the determinations of the proper measure and the amount of damages to compensate Allington for these harms caused by Helzer Farms' trespass. As relevant here, Allington alleged that it uses its property for recreational purposes and sought compensation for the loss of approximately 1 acre of "mature trees," which "severely impinge[d] on their ability to derive enjoyment from the property." We next detail the evidence adduced at trial relevant to the issue of damages and the parties' disputes therein.

(a) Area of Trespass

The size of the trespassed area was disputed at trial. Three areas of Allington's property were relevant. The first was a triangular area that extended south from the property line, into Allington's property. For the purpose of clarity, we refer to this area simply as the "triangle." The parties generally agreed that when properly surveyed and calculated, the triangle covered .46 acres. The parties also agreed that the triangle was entirely and heavily treed before the trespass and that, as a result of the trespass, all the trees were removed. It was Helzer Farms' position that the triangle was the only "damaged area" for which Allington should be compensated.

The second relevant area ran along the property line, which we understand to have generally been a hedgerow. The precise length of this area and the number of trees removed

---

[5] See Neb. Rev. Stat. § 34-112.01 (Reissue 2016).

therefrom were also contested. Jake testified to the removal of trees from the area along the fence line directly to the west and east of the triangle, stating that the density of trees in that area was similar to that of the triangle and that together, the triangle and this area covered .92 acres. The parties generally agreed that the combined area had an upward grade and served as a water drainage area, where water flowed north through it to a creek to the east. Allington's expert witness at trial referred to the combined .92-acre area as a "swale," which he defined as a "shallow drainage conveyance." For the purposes of clarity, we too will refer to the combined .92-acre area as the "swale."

The third relevant area was an additional 667 linear feet of the hedgerow, extending from the swale along the property line to the east. Allington's expert witness identified that this area was subjected to the removal of trees and vegetation during his site inspection. Adding this area to the .92-acre swale, the expert calculated a total "affected area" of 1.38 acres of Allington's property.

### (b) Removed Trees

By all accounts, most of the trees removed from Allington's property were eastern red cedar trees. We note that red cedar trees are referred to as "false cedars," as they are a type of juniper, not a type of cedar. However, because the parties spoke of the red cedar trees colloquially as "cedar" trees, we do the same.

Nick described the southern borderline as "[v]ery heavily wooded, [with] thick cedars, some thorn trees, Russian olives or whatever you would want to call them." The excavator operator responsible for the trees' removal testified that the trees "weren't young, but they weren't old either." The following exchange with Allington's counsel occurred during his testimony regarding the size of the trees.

Q. . . . [W]ere these large trees that you were removing?
A. No.

Q. I guess what's your definition of a large tree?

A. Probably a lot different than most people. If I can grab it with a backhoe and pluck it out of the ground root ball and all, it's not a large tree.

The operator testified that "the majority of the trees . . . were small enough that the excavator [could] basically grab them and pop them out by itself, but the — some of the larger ones[,] the [bull]dozer needed to do some ripping around the trees to loosen the roots." When asked whether the trees were taller than the excavator, he replied that "there might have been a couple that were." Allington introduced photographs that showed the excavator removing trees substantially taller than it. However, Helzer Farms asserted that those trees were on its property—not Allington's.

Jake testified that in the triangle, the trees were mostly cedar trees that were "probably" 8 to 10 feet tall and "compacted pretty hard," but that "[o]ccasionally[,] there would be a hardwood [(i.e., deciduous tree)] in there." However, the area along the property line had "some bigger cedar trees, locust trees, a couple hackberry trees[, and] some walnut trees . . . ." He described that the trees in the triangle were "smaller," whereas the trees along the property line were "mature."

### (c) Purpose and Use

Jake testified that he works at a fertilizer plant, where he serves as the "gatekeeper" for the maintenance department. Since 2004, he had also been doing business as Outdoors Unlimited, which he described as "a tree clearing, food plots, and et cetera, business." In 2021, he formed Outdoors Unlimited, LLC. Since 2018, when Jake inherited the Allington property, he has also farmed, at least part time.

Jake also testified that as a child, he lived in Wymore, Nebraska, and that the Allington property "was a place to go play." Throughout his entire life, he and his family have used the property for recreational activities, such as hunting, trapping, and fishing on the riverbank. Jake and his children used

the triangle for watching wildlife and for "hunting purposes," as the wildlife would travel from it to nearby food plots. The triangle provided a water source for wildlife, and the primary purpose for which he used the area was as "wildlife habitat."

Jake further testified that since the trees were removed from the triangle, he has planted wildlife food plots—such as clover, alfalfa, ryegrass, turnips, and corn—to prevent soil erosion and maintain the area until he is compensated for Helzer Farms' trespass and can afford to replant trees.

### (d) Appraised Land Value

Helzer Farms called a licensed real property appraiser to testify as to the effect of its trespass on the fair market value of the Allington property.

The appraiser determined that the Allington property comprised a total area of 306 acres, consisting of four distinct soil types, and, after the trespass, had 45 treed acres. In appraising the property, he determined that the entire 306 acres was agricultural land made up of 67 percent "dryland" and that the remainder 33 percent was a "combination of treed pasture and waste." The appraiser concluded that the "primary use" of the property was "agricultural production, not recreation," because recreational land is land that "could be leased out or enjoyed beyond the agricultural production." He explained that recreational land has a different "highest and best use" from agricultural land. Because the land was agricultural, the value of the land was affected only by the utility of the farm operation or changes to features that affected production, such as the production area. He testified that appraising real property "deal[s] with contributory value and how it contributes to the overall property."

He opined that if the Allington property "were a recreational-use property," then different considerations would be utilized in appraising the property, and that there "would be a different consideration of the tree loss as it relates to that." But trees "have no contributory value . . . to an agricultural

piece of property." Accordingly, to maximize the Allington property's agricultural production, and thereby its value, all trees should be removed from the property because "[c]rop-land has a higher value than treed ravines." As 306 acres of agricultural land, the appraiser valued the Allington property, excluding improvements, at $2,900 an acre, for a total land value of $887,400.

The appraiser further testified that he had never previously provided a valuation or appraisal for the restoration cost of trees. He acknowledged that "[s]ome people like trees" and that trees "help with water management." But in his opinion, trees did not "have a commercial value." Accordingly, the loss of the trees on Allington's property "would not be recognized by the market." It was the appraiser's expert opinion that the trespass increased the value of the property because the removal of trees increased the farmable acreage on the property; however, the removal of trees from the triangle's .46 acres was too small to affect the market value of the property. Thus, he concluded that there was no change in the market value of the Allington property caused by Helzer Farms' trespass.

(e) Cost of New Trees

Allington called Aaron Oltmans of Plains Tree Farm, Inc., to establish the cost of planting new trees on Allington's property. Plains Tree Farm is a tree nursery that was established by Oltmans' family in the early 1970s. At the time of trial, Oltmans was both a shareholder and the manager of Plains Tree Farm.

During his examination, Oltmans rejected discussing trees by size. As he explained, "big" is a relative term: "My big and your big might be two different things[.]" Instead, Oltmans discussed trees based on age. A "sapling" is a young tree. Over time, a sapling becomes a "mature" tree.

Oltmans testified that the maturity of a tree varies and depends upon opinion. As to cedars, as a coniferous (evergreen)

tree, it was Oltmans' opinion that a cedar sapling would be in the range of 2 to 4 feet tall and would "take probably 10 to 15 years" to mature. He explained that even though a cedar would grow to be 30 to 35 feet tall, a cedar would generally be considered mature when it was 20 feet tall.

Oltmans testified that, upon request, he provided Allington's expert witness on valuation (whose testimony we discuss next) with a rough quote of $200 per sapling for a mixture of 200 saplings. He also testified that the largest cedar tree available from Plains Tree Farm would be 10 to 12 feet tall and cost in the range of $550 to $600, including transportation and planting.

### (f) "Functional Replacement" Cost

Allington's expert witness on valuation was Joseph Mangan. Mangan started his career in 1984, "doing economic modeling for a registered investment advisory firm," but became an agricultural tree consultant in the early 1990s. He had operated under The Tree Consultants LLC for the previous 5 years and as a sole proprietor before that. Mangan has been a certified arborist since 1993, is a registered consulting arborist, and possesses a tree risk assessment qualification. He also conducts tree appraisals.

Based on samplings he conducted of three different areas of Allington's property, Mangan estimated that there were 300 to over 400 trees in the swale prior to the trespass. However, Mangan believed that 200 trees was the correct number to accomplish restoration of the total affected area, i.e., 1.38 acres. As he characterized the issue, it was about "functional replacement," rather than "replication" of the precise pre-trespass condition. He explained:

> [W]e are trying to functionally replace the benefit of the trees, of the trees that were there[,] and the benefits that they provided. So[,] the correct approach, in my opinion, is functional replacement.

The function that the trees were providing and the benefits [are] what we're trying to replace. We're not trying to match tree for tree, species for species.

In calculating his functional replacement cost, Mangan began with Oltmans' quoted cost of $40,000 for 200 saplings. However, "[a] small tree will not provide the benefits that a large tree does." "Time is the issue. . . . So[,] what needs to be added to these small trees is the element of time." The issue was that Allington would continue to be harmed from the trespass until new saplings reached the age of maturity, when they would finally serve as a replacement for those that were lost, and during their growth, those trees would need to be cared for by Allington.

Accordingly, Mangan employed a cost-compounding technique. He estimated that it would take 15 years "of growth and establishment to restore [the removed trees'] functionality." In his prepared report, he defined the concept as determining the "equivalent benefit being accrued" from the trees at the time of the Helzer Farms' trespass. Mangan determined a compounding rate of 5 percent was a "conservative and appropriate" rate to serve as a measurement of the future harm to account for the time it takes for the trees to grow until they ultimately "replace the functionality of the removed trees."

As applied, Mangan calculated a functional replacement cost that totaled $83,157 for the harm caused by Helzer Farms' trespass. He reached that amount by taking the total initial purchase cost ($40,000) for 200 saplings ($200 each) and compounding it at 5 percent over 15 years to account for the time it takes for the trees to grow. Helzer Farms did not object to Mangan's use of a compounding rate. Mangan also applied a second methodology for valuing the harm caused by Helzer Farms' trespass.

### (g) Value of "Lost Benefit"

Mangan's appraisal also included a "lost benefit" approach to valuing the harm Allington suffered from Helzer Farms'

trespass. Instead of focusing on the trees' function, this second method focused on the loss of the benefit provided by the area affected by the trespass. Mangan testified that the primary ecological benefit of the trees in the applicable location was as a "conservation buffer." As his report noted: "'Conservation buffers are . . . called by many names, including wildlife corridors, greenways, windbreaks, and filter strips to name just a few . . . .'" His report detailed that conservation buffers provide benefits, including "'protecting soil resources, improving air and water quality, enhancing fish and wildlife habitat, and beautifying the landscape.'"

Mangan's report framed the lost benefit theory with the following:

> What value were the trees? They do not produce income as timber might. They do not serve the same purpose [as] trees in an urban or suburban landscape setting. Their presence or absence may not move the market value appreciably. Nonetheless, their function and presence contributed significantly to the well[-]being of [the] local environment and beyond. Their absence is causing ecological harm.

Accordingly, the loss of benefit approach Mangan employed "calculates the value of an acre of conservation buffer land as it contributes to flood control, water quality, wildlife habitat[,] and recreation."

Mangan testified that numerous government agencies run conservation buffer programs, including the Nebraska Department of Agriculture and the U.S. Department of Agriculture (USDA). The USDA has provided the public with a Microsoft Excel-based tool called Buffer$ to analyze the cost benefits and other values of conservation buffers for agricultural land. Using that tool, Mangan obtained estimated low and high per-acre values for conservation buffer zones, calculated by the USDA National Agroforestry Center. Mangan reasoned that "Nebraskans are at least as *conservation minded* as the average landowners with a cropland forest interface,"

and on that basis, he utilized the USDA National Agroforestry Center's midpoint value of $90,000 per acre to value the loss of benefit caused by Helzer Farms' trespass.

Mangan then applied the $90,000-per-acre value to his previously calculated total affected area of 1.38 acres and determined that, as a result of the trespass, Allington lost a benefit of $124,200.

At trial, Helzer Farms objected to the admissibility of any opinion offered by Mangan concerning "any . . . buffer zone." The court rejected Helzer Farms' arguments, framing the trial question as "whether this conservation buffer is an appropriate damage consideration." Accordingly, the court found evidence pertaining to the loss of benefit approach to be admissible, while its ultimate weight was to be determined as part of the factual issues before it.

### (h) Valuation Expert Opinion

In light of his calculated functional replacement cost and value of loss of benefit approaches, it was Mangan's expert opinion that a range between $83,157 and $164,200 represented the harm caused by Helzer Farms' trespass: $83,157 calculated under the functional replacement approach, $124,200 under the loss of benefit approach, and $164,200 by adding the purchase cost of replacement saplings ($40,000) to the loss of benefit approach.

### 2. COUNTY COURT JUDGMENT

In its written judgment, the county court specifically found that (1) the area where the damage occurred was used by Allington for recreational purposes, (2) the trees removed and destroyed were mostly mature cedar trees, (3) it would take 200 trees at a cost of $200 per sapling to replace the mature trees "irrespective of the destroyed trees being cedar," (4) Mangan's theory and methodology as to valuing the "destroyed mature trees replaced with starter stock by compounding [was] sound and generally accepted within the tree

consulting industry," (5) there was insufficient evidence to support the application of Mangan's loss of benefit methodology, and (6) the present value of the cost of replacement was $83,157.[6] We note that neither party made a request for specific findings at trial.[7]

The court also concluded that Allington's damages should not be limited to the fair market value of the land directly impacted by Helzer Farms' trespass, which we discuss in further detail below. The court entered judgment accordingly, awarding Allington $83,157 in damages.

### 3. District Court Appeal

Helzer Farms appealed to the district court. The district court determined that the county court's judgment conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. Accordingly, it affirmed the county court's judgment. Helzer Farms filed a timely appeal, which we moved to our docket on our own motion.[8]

### III. ASSIGNMENTS OF ERROR

Helzer Farms assigns, summarized and restated, that the district court erred in affirming the judgment of the county court because the county court erred in the following ways:

---

[6] See Neb. Rev. Stat. § 24-517(5)(a) (Cum. Supp. 2022) ("upon the request of any party," county court required to certify civil proceedings to district court when pleadings or discovery indicate amount in controversy over statutory limit). See, also, *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001) (certification to district court of civil proceeding in which amount in controversy exceeds statutory limit mandatory only upon request of party).

[7] See Neb. Rev. Stat. § 25-1127 (Reissue 2016) ("[u]pon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except, generally, for the plaintiff or defendant, unless one of the parties request it . . .").

[8] See, Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024); Neb. Ct. R. App. P. § 2-102(C) (rev. 2022).

by (1) finding Allington used the relevant area for recreational purposes; (2) concluding that Allington was entitled to damages in an amount of replacement cost, instead of diminution of market value; (3) concluding that Allington's damages were not limited to the fair market value of the trespassed area; (4) admitting Oltmans' testimony about the cost of cedar trees and Mangan's related expert opinion; (5) failing to find the specific size of the affected area and finding that it would take 200 trees to replace the trees destroyed by the trespass; and (6) finding that the replacement cost of the harm caused by its trespass was $83,157.

## IV. STANDARD OF REVIEW

[1] In appeals from the district court sitting as an appellate court, the immediate question is whether the district court erred in its appellate review of the county court's decision, but review of that question necessarily involves considering the decision of the county court.[9]

[2,3] In an appeal from the county court general civil docket, a judgment rendered by the county court is reviewed for error appearing on the record.[10] When reviewing a judgment for error appearing on the record, the inquiry is whether the decision conforms to law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[11]

[4-6] Whether a decision conforms to law is, by definition, a question of law, to which an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below.[12] Competent evidence is evidence that is admissible and tends to establish a fact in

---

[9] *Sedighi v. Schnackel Engineers*, 317 Neb. 890, 12 N.W.3d 507 (2024).

[10] See *Peterson v. Brandon Coverdell Constr.*, 318 Neb. 342, 15 N.W.3d 698 (2025). See, also, Neb. Rev. Stat. §§ 25-1911 and 25-2733 (Reissue 2016).

[11] See *Peterson v. Brandon Coverdell Constr., supra* note 10.

[12] *Sedighi v. Schnackel Engineers, supra* note 9.

issue.[13] A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis that would lead a reasonable person to the same conclusion.[14] A capricious decision is one guided by fancy rather than by judgment or settled purpose.[15] The term "unreasonable" can be applied to a decision only when the evidence presented leaves no room for differences of opinion among reasonable minds.[16]

## V. ANALYSIS

To begin, we note that our appellate review of this case was greatly aided by the county court's commendable efforts to ensure that the bill of exceptions thoroughly reflected the proceedings and contained the details of the parties' arguments and the court's rulings with both clarity and specificity.

We first address Helzer Farms' interpretation of the damages limitation this court set forth in *Keitges v. VanDermeulen*.[17] We then address Helzer Farms' assignments of error and its specific challenges underlying the damages awarded by the county court.

### 1. Limitation of Restoration Cost Damages for Property Harms

Both parties assert that the damages issue in this case is controlled by our decision in *Keitges v. VanDermeulen*.

### (a) *Keitges v. VanDermeulen*

Like Helzer Farms, the defendant in *Keitges v. VanDermeulen* trespassed onto the plaintiff's land with a bulldozer and chain saw when clearing a path for a property division fence. As a

---

[13] *Id*.

[14] See *id*.

[15] *Id*.

[16] *Id*.

[17] *Keitges v. VanDermeulen, supra* note 1.

result, the defendant caused damage to an area of the plaintiff's 10.01-acre tract at least 450 feet long and 8 to 10 feet wide, which contained approximately 100 trees.

At trial, the court refused to admit evidence of prospective restoration costs—derived from a contractor's estimate—because "'the evidence revealed that it was random growth, the trees were not of an ornamental type. There was no evidence that they were crop-type, cash-type trees.'"[18] We discerned the trial court to have concluded that "because the trees which the defendant had destroyed were not 'ornamental' and were not harvested as timber, the plaintiffs could recover only the diminution in value of their land" and thus, "evidence as to the potential feasibility and cost of restoring the property was irrelevant and prejudicial."[19]

The question before us on appeal was framed as "whether a plaintiff is entitled to recover the cost of restoring trees and vegetation on land which he [or she] holds for residential or recreational purposes when a portion of a natural woods is destroyed."[20] The defendant argued that damages must be measured by the diminution in the market value of the land because the harm it caused was to "'random growth' indigenous to the area, rather than 'ornamental or rare' trees."[21] In keeping with our precedent, we rejected any distinction between "'random growth'" and "'ornamental or rare'" trees as an "artificial distinction."[22] We explained:

> One person's unsightly jungle may be another person's enchanted forest; certainly[,] the owner of such land should be allowed to enjoy it free from a trespasser's bulldozer. Indeed, a trespasser should not be allowed, with impunity, to negligently or willfully wreak havoc

----

[18] *Id*. at 584, 483 N.W.2d at 140.

[19] *Id*. at 585, 483 N.W.2d at 140.

[20] *Id.*

[21] *Id*. at 589, 483 N.W.2d at 143.

[22] *Id.*

on a landowner's natural woods, and the landowner's attempted recovery for such injury should not be entirely frustrated by the fact that the market does not reflect his [or her] personal loss.[23]

Ultimately, in line with our prior precedent, we held that

in an action for compensatory damages for cutting, destroying, and damaging trees and other growth, and for related damage to the land, when the owner of land intends to use the property for residential or recreational purposes according to his [or her] personal tastes and wishes, the owner is not limited to the difference in value of the property before and after the damage or to the stumpage or other commercial value of the timber. [The owner] may recover as damages the cost of reasonable restoration of [the] property to its preexisting condition or to a condition as close as reasonably feasible.[24]

In sum, we held in *Keitges v. VanDermeulen* that the reasonable cost necessary to restore land to its preharm condition can be the proper measure of damages when the owner of land was harmed by the loss of trees and other vegetation based on the land's use.

With that established, we then went on to cite our recent holding from *"L" Investments, Ltd. v. Lynch*[25] and stated:

However, the award for such damage may not exceed the market value of the property immediately preceding the damage. . . . If improvements have been constructed on the damaged realty, recovery for restoration of damaged trees and vegetation should be limited to an amount not exceeding the market value of the land as if it were unimproved.[26]

---

[23] *Id.*

[24] *Id*. at 589-90, 483 N.W.2d at 143.

[25] *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 322 N.W.2d 651 (1982).

[26] *Keitges v. VanDermeulen, supra* note 1, 240 Neb. at 590, 483 N.W.2d at 143 (citation omitted).

We held that the damages cap we set forth in *"L" Investments, Ltd. v. Lynch* was applicable insofar as it applied to the market value of the unimproved land.

### (b) Helzer Farms' Interpretation

Helzer Farms contends that within the *Keitges v. VanDermeulen* limitation of restoration damages to "the market value of the property immediately preceding the damage," the word "property" refers to the specific portion of the land where the trees were destroyed. If correct, Allington's compensatory damages would be limited to the value of 1.38 acres of their land. We disavow that narrow reading. As the county court noted in its written judgment, in *Keitges v. VanDermeulen*, we "did not limit recovery to the pre-damage market value of only the damaged acres in question."

### 2. Applicability of Restoration Cost Damages

We turn to Helzer Farms' assignments related to the applicability of restoration cost damages in this case.

Helzer Farms takes issue with the county court's finding that Allington used the relevant area for recreational purposes, and its conclusions that restoration cost damages were appropriate in this case and that the restoration cost damages should not have been limited by the fair market value of the triangle's area.

[7] We first determine that the court's finding that the relevant area was used for recreational purposes is supported by competent evidence.[27] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, and an appellate court will not disturb those findings unless they are clearly erroneous.[28] Jake testified to the use of the area for recreational purposes and as "wildlife habitat." We find no error with the court's factual finding.

---

[27] See *Keitges v. VanDermeulen, supra* note 1.

[28] *Perkins v. RMR Building Group, ante* p. 707, 30 N.W.3d 148 (2026).

[8] Because the court did not err in its factual finding, we disagree with Helzer Farms' argument that restoration cost damages were not appropriate in this case. The value of Allington's trees was dependent upon their use. An owner of residential or recreational land may recover as damages the costs of reasonable restoration of the property to its preexisting condition or to a condition as close as reasonably feasible.[29]

Similarly, we are not persuaded by Helzer Farms' argument that the restoration cost damages in this case should have been limited to the diminution in fair market value of the underlying land of the triangle. As discussed above, *Keitges v. VanDermeulen* does not support such a limitation.

We next address Helzer Farms' challenges to the admission of testimony by Allington's experts.

### 3. Admission of Expert Testimony

On appeal, Helzer Farms takes issue with the county court's admission of Oltmans' testimony regarding the cost of cedar trees because that testimony was beyond the scope of Oltmans' disclosed testimony. Helzer Farms argues that it was unfairly prejudiced because Oltmans' testimony permitted Allington to introduce a "new theory of damages" and a "new expert opinion" at trial.[30] Helzer Farms asserts that, as disclosed in discovery, Mangan's expert opinion was based on planting a mixture of saplings, rather than solely cedar trees, and that Oltmans' previously undisclosed testimony about the cost of cedar trees allowed Mangan to revise his expert opinion at trial.[31]

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"[32]

---

[29] *Keitges v. VanDermeulen, supra* note 1.

[30] Brief for appellant at 28.

[31] But see Neb. Rev. Stat. §§ 27-703 and 27-705 (Reissue 2016).

[32] Neb. Rev. Stat. § 27-103 (Reissue 2016).

First, we observe that the record reflects that, pretrial, Helzer Farms objected and moved in limine to exclude the testimony of other witnesses, but not Oltmans, who would have testified on the issue of the cost of trees, cedar or otherwise. Additionally, before trial, Helzer Farms informed the court that Oltmans had been disclosed as a witness and that it "had an opportunity to look into" him. We also note that, at trial, Helzer Farms expressly indicated to the court that it "took a deposition of [Oltmans]."

As the manager of Plains Tree Farms, Oltmans had personal knowledge of the cost of purchasing trees from Plains Tree Farms.[33] Mangan's report as to his expert opinion concerning his functional replacement approach relied on a price quote from Plains Tree Farms and Oltmans for a mixture of saplings. At trial, Helzer Farms objected to the portion of Mangan's report concerning his conservation buffer approach, but not the portion regarding his functional replacement approach, which was predicated on Oltmans' original quote for the mixture of saplings. Moreover, the court's damages award was consistent with Mangan's functional replacement approach. For these reasons, the admission of Oltmans' testimony about the cost of cedar trees was not prejudicial to a substantial right of Helzer Farms. We find no error warranting reversal in the court's admission of Oltmans' testimony.

Helzer Farms also assigns that the court erred "in finding that Mangan was qualified as an expert witness." Instead of a challenge to Mangan's qualifications as an expert, we understand Helzer Farms' specific argument to be that Oltmans provided insufficient foundation regarding the cost of cedar trees to support Mangan's opinion based on his functional replacement cost approach. Specifically, Helzer Farms contends Oltmans provided "insufficient testimony to support a finding that it would cost $200 per replacement cedar tree."[34]

---

[33] See Neb. Rev. Stat. § 27-602 (Reissue 2016).

[34] Brief for appellant at 30. But see § 27-602.

Mangan's opinion about the cost of replacement trees remained predicated on functional replacement and not direct replacement of each lost tree. His opinion was that planting a mixture of 200 saplings was appropriate to restore the wildlife habitat that Allington lost. The court, in its judgment, implicitly found that Mangan's functional replacement approach was appropriate for restoration cost damages. This assignment is resolved by our finding above that Helzer Farm suffered no prejudice to a substantial right from the admission of Oltmans' testimony about the cost of cedar trees. We find Helzer Farms' argument unpersuasive.

## 4. Damages Award

Finally, Helzer Farms challenges the court's failure to specifically find the size of the affected area and the court's factual findings that it would take 200 trees to replace the trees destroyed by the trespass and that the replacement cost of the harm caused by its trespass was $83,157.

As for the court's failure to specifically find the size of the area affected by Helzer Farms' trespass, we find no error. "Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except generally for the plaintiff or defendant, unless one of the parties request it . . . ."[35] Here, the record is devoid of any such request by Helzer Farms for a specific finding of the size of the affected area. Moreover, in adopting Mangan's functional replacement approach to restoration, the court's judgment can be read as implicitly finding the size of the area affected was that as calculated by Mangan—1.38 acres. In this case, the court's failure to make a specific finding that was not requested by Helzer Farms does not constitute reversible error.

Turning to the court's factual findings, in a bench trial of a law action, the trial court's factual findings have the effect

---

[35] § 25-1127.

of a jury verdict, and an appellate court will not disturb those findings unless they are clearly erroneous.[36]

[9] The purpose of restoration cost damages is to restore the property to its preexisting condition or to a condition as close as reasonably feasible. Mangan's expert testimony established that "functional replacement," rather than direct replacement, was proper in this case. We agree.

[10] Restoration cost damages are distinct from replacement cost damages. The purpose of restoration cost damages is to restore the property to its prior use, not to compensate for a direct replacement. Due to their unique nature, trees cannot be replaced.[37] The record shows that Mangan's functional replacement approach was the reasonably feasible manner to restore the property to its pretrespass condition. We find no error in the court's finding that 200 saplings would be needed to restore Allington's property or in the court's finding that the saplings would cost $200 each. We also find no plain error in the court's finding that Mangan's 5-percent compounding rate for 15 years was a proper measure of Allington's future harm. Helzer Farms did not object to Mangan's use of a compounding rate, and accordingly, we express no opinion about that methodology.

An owner of land may recover as damages the cost of reasonable restoration of the property to its preexisting condition or to a condition as close as reasonably feasible.[38] The court adopted Mangan's functional replacement approach, and its finding of the appropriate amount of damages was supported by competent evidence.

Testimony was adduced that between 300 and 400 mature trees were destroyed. The trees in the triangle were mostly 8- to 10-foot cedars, and the cost of planting a 10- to 12-foot cedar was $550 to $600. At that price, 300 10- to 12-foot cedar

---

[36] *Perkins v. RMR Building Group, supra* note 28.

[37] See *Koyen v. Citizens Nat. Bank*, 107 Neb. 274, 185 N.W. 413 (1921).

[38] *Keitges v. VanDermeulen, supra* note 1.

trees would cost $165,000 to $180,000. By contrast, Mangan determined the functional replacement cost to be $83,157.

Based on our review of the record, we determine that the restoration cost damages awarded by the court are reasonable for the harm Helzer Farms caused by its trespass. The damages awarded do not run afoul of the limiting rule in *Keitges v. VanDermeulen* because they do not exceed the value of Allington's property. We find no error in the court's damages award.

## VI. CONCLUSION

We disavow a narrow reading of *Keitges v. VanDermeulen* that would limit a restoration cost damages award for the total loss of trees and other vegetative growth to the value of the specific portion of the land where the trees were destroyed. Moreover, there is competent evidence in the record that supports the county court's finding that Allington used the affected land for residential or recreational use and its damages award. The record also supports a finding that the restoration costs are reasonable. The district court did not err in affirming the judgment of the county court.

AFFIRMED.

MILLER-LERMAN, J., not participating in the decision.

CASSEL, J., concurring.

I join the court's opinion without reservation. To the extent my learned colleague's concurring opinion suggests that the value-based limiting principle—applicable to restoration cost as compensation for harm to growing trees—should be abandoned, I respectfully disagree.

First, I read the Supreme Court of South Carolina's opinion[1] to rely upon the "reasoning expressed in the Restatement (Second) of Torts § 929, *Keitges*, [an Alaska Supreme Court

---

[1] See *Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 623 S.E.2d 373 (2005).

decision], and [a Minnesota Supreme Court decision]."[2] Although the Nebraska case preceded discussion of the others, the South Carolina court discussed all three decisions, plus the Restatement.

Second, I agree with the *Keitges* rule: Compensation to the property owner for restoration cost may be appropriate up to, but not exceeding, the full value of the land before the tortious harm. Anything beyond that would confer an economic benefit that otherwise could not have been realized. I do not rule out the possibility of unusual circumstances justifying a deviation from the general rule. But no such circumstances appeared here.

Finally, the doctrine of stare decisis must be considered. While the doctrine of stare decisis is entitled to great weight, it is grounded in the public policy that the law should be stable, fostering both equality and predictability of treatment.[3] Overruling precedent is justified when the purpose is to eliminate inconsistency.[4] Remaining true to an intrinsically sounder doctrine better serves the values of stare decisis than following a more recently decided case inconsistent with the decisions that came before it.[5] Some of the relevant factors in deciding whether to adhere to the principle of stare decisis include workability, the antiquity of the precedent, whether the decision was well reasoned, whether experience has revealed the precedent's shortcomings, and the reliance interests at stake.[6]

I am not persuaded that any of these factors weigh heavily toward abandoning the *Keitges* limitation. Here, it allowed the restoration costs as awarded by the finder of fact. In other

---

[2] *Id.* at 484, 623 S.E.2d at 377.

[3] *McEwen v. Nebraska State College Sys.*, 303 Neb. 552, 931 N.W.2d 120 (2019).

[4] *Id.*

[5] *Id.*

[6] *Id*.

words, it was workable. I hesitate to speak of a decision adopted the same year I began judicial service as antique, but 34 years is a pretty long time. While other reasoning could have carried the day 34 years ago, it did not. I do not view that as a critique of the reasoning that *was* adopted. I see nothing in the Nebraska experience revealing any shortcoming, nor does my colleague's concurrence point to any except by a hypothetical situation. While reliance might not apply to a malicious wrongdoer, a trespasser by mistake is nonetheless a trespasser, and it seems reasonable that persons who exercise ordinary care in removing trees along a boundary line reasonably may rely on a rule of law limiting a neighbor's restoration damages to the full market value of the neighbor's property.

For these reasons, I am skeptical that allowing restoration damages to trees and vegetation in an amount exceeding the fair market value of the entire property on which the harm occurs would be a better rule.

BERGEVIN, J., concurring.

I agree with the majority's decision to affirm the judgment of the district court. However, I write separately because, although I agree with the majority's reading of *Keitges v. VanDermeulen*,[1] I am not convinced that the limiting principle set forth in *"L" Investments, Ltd. v. Lynch*[2] is applicable to the damages sustained in this case. For the reasons I set forth below, I would abrogate *Keitges v. VanDermeulen* to the extent it holds that restoration cost damages for trees and vegetation on residential or recreational land are limited to the fair market value of the land.

Our precedent concerning the proper measure of damages is based on "'[t]he basic principle of the law of damages[:] that such compensation in money shall be allowed for the loss sustained as will restore the loser to the same value of property

---

[1] *Keitges v. VanDermeulen*, 240 Neb. 580, 483 N.W.2d 137 (1992).

[2] *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 322 N.W.2d 651 (1982).

status as he occupied just preceding the loss.'"[3] An injured party should be able to recover damages in the amount that the party was harmed. In awarding damages, "[t]he primary object is to determine the amount of the loss. Whatever rule is best suited to that determination should be followed. The recovery must be reasonable[,] having its basis in a proper consideration of all relevant facts."[4] In other words, the appropriate measure of damages depends on the loss incurred.

The wildlife habitat destroyed in this case is incapable of being repaired—a felled tree cannot be re-earthed, nor can a tree be reassembled after it has been through the woodchipper. "Trees [also] cannot be replaced[,] except by waiting for the processes of nature to grow and develop them."[5] While modern technological advancements may allow for some degree of replacement, as with all living things, the unique nature of the thing destroyed must be considered. As we recognized in *Keitges v. VanDermeulen*, treed property can be restored, and the cost to restore the land to its previously treed condition is a proper measure of damages.

Just as the appropriate measure of damages depends on the loss incurred, so too should the appropriate limitation of damages depend upon the loss incurred. In *"L" Investments, Ltd. v. Lynch*, we held that when a real estate improvement is harmed, without harm to the value of the real estate, and the improvement can be repaired, the proper measure of damages is the reasonable cost of repair.[6] We further held that if the cost to repair the improvement exceeds the market value of the improvement just before the injury, then the proper

---

[3] *Id*. at 327, 322 N.W.2d at 656 (quoting *Davenport v. Intermountain R. L. & P. Co.*, 108 Neb. 387, 187 N.W. 905 (1922)). See, also, *Koyen v. Citizens Nat. Bank*, 107 Neb. 274, 185 N.W. 413 (1921).

[4] *Joiner v. Pound*, 149 Neb. 321, 327, 31 N.W.2d 100, 104 (1948).

[5] *Koyen v. Citizens Nat. Bank, supra* note 3, 107 Neb. at 276, 185 N.W. at 414.

[6] See *"L" Investments, Ltd. v. Lynch, supra* note 2.

measure of damages is the difference in the market value of the improvement before and after the harm occurred. Relevant here, our holding limits the repair cost damages of the improvement for partial damage to the total value of the same improvement.

In *Keitges v. Vandermeulen*, this court imported the limitation on repair cost damages for an improvement from *"L" Investments, Ltd. v. Lynch* to cases involving restoration cost damages for trees and vegetation. However, the partial loss of an improvement is fundamentally distinct from the total loss of trees suffered in *Keitges v. VanDermeulen* and the instant case.

*Keitges v. VanDermeulen* limits restoration cost damages for trees and vegetation to the fair market value of the land. This limitation does not account for trees and vegetation having value independent of the land. In this case, the trees that created Allington's wildlife habitat had a value independent from the value of Allington's land. The value of what Helzer Farms destroyed was personal to Allington and not based on the market value of Allington's land—neither the whole nor the specific area affected by the trespass.

The application of this limitation on restoration cost damages also permits perplexing results. Suppose two neighbors each had 1 acre of wildlife habitat destroyed by a third neighbor. The first neighbor owned 20 total acres. The second neighbor owned 100 acres. Despite the two neighbors' incurring an identical harm to 1 acre, when applying the rule stated in *"L" Investments, Ltd. v. Lynch*, the second neighbor would be able to recover a greater amount of damages than the first. But in relation to their land, the first neighbor had 5 percent of their property destroyed, while the second had only 1 percent.

In my view, we should not continue to endorse this theory of damages limitation. Only one other jurisdiction could be found to prescribe to the application of such a damages limitation

as set out in *Keitges v. VanDermeulen*.[7] Significantly more jurisdictions recognize, as Nebraska does, that the restoration costs must be reasonable.[8] The Restatement (Second) of Torts also takes this approach. If "there is a reason personal to the owner for restoring" property to the original condition, such as if it is "used for a purpose personal to the owner," damages are ordinarily reasonable restoration damages, "even though this might be greater than the entire value."[9]

I am unpersuaded that there is any logical connection or jurisprudential basis for the application of the *"L" Investments, Ltd. v. Lynch* limitation of repair cost damages for improvements to restoration cost damages for trees and vegetation on residential or recreational land. I would abrogate *Keitges v. VanDermeulen* to the extent it limits restoration cost damages to the fair market value of the land.

Papik and Freudenberg, JJ., join in this concurrence.

---

[7] See *Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 623 S.E.2d 373 (2005).

[8] See, *Osborne v. Hurst*, 947 P.2d 1356 (Alaska 1997); *Klingshirn v. McNeal*, 239 Ga. App. 112, 520 S.E.2d 761 (1999); *Ringneck Farms LLC v. Steuwe*, No. 121,879, 2020 WL 5268234 (Kan. App. Sept. 4, 2020) (unpublished opinion); *Roman Catholic Church v. Louisiana Gas*, 618 So. 2d 874 (La. 1993); *Trinity Church in the City of Boston v. John Hancock Mutual Life Ins. Co.*, 399 Mass. 43, 502 N.E.2d 532 (1987); *The Rector Etc. of St. Christopher's v. C. S. McCrossan, Inc.*, 306 Minn. 143, 235 N.W.2d 609 (1975); *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 338 Mont. 259, 165 P.3d 1079 (2007); *Denoyer v. Lamb*, 22 Ohio App. 3d 136, 490 N.E.2d 615 (1984); *Morabit v. Hoag*, 80 A.3d 1 (R.I. 2013). See, also, *Brooks v. City of Huntington*, 234 W. Va. 607, 768 S.E.2d 97 (2014) (reasonable repair cost damages).

[9] Restatement (Second) of Torts § 929, comment *b*. at 546 (1979).